# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

HAYS MEDICAL CENTER, et al.,

        Plaintiffs,

v.

        Case No. 15-9893-JTM

SYLVIA MATHEWS BURWELL, Secretary
*In Her Official Capacity as Secretary of
Health and Human Services*,

        Defendant.

## MEMORANDUM AND ORDER

      Plaintiffs are Medicare-participating hospitals challenging, under the Administrative Procedure Act ("APA"), the calculation of their hospital-specific Medicare payment rates by defendant Sylvia Mathews Burwell, the Secretary of the Department of Health and Human Services ("the Secretary"). Plaintiffs allege that the Secretary erroneously calculated their reimbursement payments under the Medicare Act—specifically, she is applying the budget neutrality adjustments twice in her calculation of their new base-year hospital-specific rates. Plaintiffs argue that the Secretary's calculation violates the Medicare statute of the Social Security Act ("SSA") and is arbitrary and capricious.

      The Secretary disagrees that she is double counting the budget neutrality adjustments, and argues that her method is a policy choice that enables her to reach budget neutrality—a statutory requirement. The question before the court is whether

the Secretary's methodology is a rational interpretation of the Medicare Act to which the court should defer. Because the court answers this question affirmatively, it will grant summary judgment to the Secretary.

I. **Uncontroverted Facts**

Plaintiffs own or operate hospitals that participate in the Medicare program, and are designated as either Sole-Community Hospitals[1] ("SCHs") or Medicare Dependent Hospitals[2] ("MDHs") under the Medicare Act. 42 U.S.C. §§ 1395ww(d)(5)(D)(iii), (d)(5)(G)(iv). Plaintiffs are eligible to be paid based on what is known as a "hospital-specific" rate.[3]

Defendant Sylvia Mathews Burwell is the Secretary of the United States Department of Health and Human Services ("HHS") and administers the Medicare program. The Centers for Medicare and Medicaid Services ("CMS"), a component of HHS, is responsible for operating the program.

Each plaintiff filed administrative appeals with the Provider Reimbursement Review Board (the "Board") challenging the Secretary's calculation of their respective hospital-specific rates used in calculating their Medicare payments. Plaintiffs bring the

---

[1] An SCH is a hospital that is the sole source of inpatient hospital services reasonably available to Medicare beneficiaries by reason of its distance from other hospitals (i.e., more than 35 miles), travel conditions or similar factors. 42 U.S.C. § 1395ww(d)(5)(D)(iii).

[2] An MDH is a hospital located in a rural area, has not more than 100 beds, is not an SCH, and has at least 60 percent Medicare utilization. 42 U.S.C. § 1395ww(d)(5)(G)(iv).

[3] "Because SCHs and MDHs provide critical services to the underserved and uninsured, Congress has adopted special payment provisions for them." *Adirondack Med. Ctr. v. Sebelius*, 29 F. Supp. 3d 25, 32 (D.D.C. 2014).

following lawsuit after the Board determined it did not have authority to grant the relief requested by plaintiffs, and granted expedited judicial review.

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The court views all evidence and reasonable inferences in the light most favorable to the non-moving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III. Medicare Reimbursement

"The Secretary. . . is charged by Congress with administering the Medicare statute." *Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs.*, 742 F.3d 1239, 1244 (10th Cir. 2014). Medicare reimburses the vast majority of hospitals, including plaintiffs, for the operating costs of inpatient hospital services through the inpatient prospective payment system ("IPPS"). Under IPPS, the Secretary informs all hospitals, before a fiscal year begins, of the "rates

at which their services will be reimbursed, regardless of costs actually incurred." *See* 42 U.S.C. § 1395ww(d). This "predetermined payment . . . is calculated based on a complex statutory formula." *Rapid City Reg'l Hosp. v. Sebelius*, 681 F. Supp. 2d 56, 58 (D.D.C. 2010). "[T]he Secretary must maintain budget neutrality when recalibrating reimbursements under the [Medicare] statute." *Adirondack Med. Ctr. v. Burwell*, 782 F.3d 707, 710 (D.C. Cir. 2015); 42 U.S.C. § 1395ww(d)(4)(C)(iii) (the Secretary must "assure[ ] that the aggregate payments . . . are not greater or less than those that would have been made for discharges in the year without [the annual group weight] adjustment[s][]"). Two factors used in calculating prospective Medicare reimbursement rates are Diagnosis–Related Groups ("DRG") and budget neutrality adjustments.

### A. Diagnosis-Related Groups

DRGs are categories of inpatient treatment that reflect the varying costs associated with treating a particular diagnosis, relative to other diagnoses. *Adirondack Med. Ctr. v. Sebelius*, 29 F. Supp. 3d 25, 29–30 (D.D.C. 2014). "Medicare patients are assigned a DRG based on their diagnosis at the time of discharge. Each DRG is associated with "a particular 'weight' [that] represent[s] the relationship between the cost of treating patients within that group and the average cost of treating all Medicare patients.'" *Id.* at 30 (quoting *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011)); 42 U.S.C. § 1395ww(d)(4). DRG weights vary from less than 1.000 to more than 7.000, and are structured such that the cost in caring for a patient assigned a DRG weight of 2.000 is twice the cost for a patient assigned a DRG weight of 1.000. *Id.* In other words,

the more complex the patient's diagnosis—requiring more resources to treat the patient—the higher the DRG weight assigned for reimbursement.[4]

The Secretary is responsible for adjusting the DRG weighting factors annually "to reflect changes in treatment patterns, technology . . ., and other factors which may change the relative use of hospital resources." 42 U.S.C. § 1395ww(d)(4)(C)(i). But the Secretary's annual DRG recalibration must "be made in a manner that assures budget neutrality. 42 U.S.C. § 1395ww(d)(4)(C)(iii). This subsection of Medicare stands for the proposition that other factors might increase the cost of Medicare reimbursements, but the Secretary must ensure that annual changes to DRG weights have a budget-neutral effect.

"In connection with recalibrating DRG weights each year, the Secretary 'normalizes' the weights so that the 'average case weight after recalibration is equal to the average case weight prior to recalibration.'" *Adirondack Med. Ctr.*, 29 F. Supp. 3d at 30–31 (quoting 74 Fed. Reg. 24080 (May 22, 2009)). But normalization alone does not achieve budget neutrality for recalibrated DRGs, and "the Secretary calculates an additional adjustment—a so-called Budget Neutrality Adjustment—to satisfy the congressional directive that changes to DRG weighting factors not increase projected aggregate IPPS payments." *Id.* at 31. ("While [normalization] is intended to ensure that recalibration does not affect total payments to hospitals, . . . [the Secretary's] analysis . . .

---

[4] The DRG classification system is complex and includes several hundred different groups to which the Centers for Medicare & Medicaid Services has assigned a numeric weight reflecting the amount of resources needed. The purpose of this system is to ensure that a hospital, for example, is paid more for a patient with heart failure than it is for a patient with a broken finger.

indicate[s] that the normalization adjustment does not achieve budget neutrality with respect to aggregate payments to hospitals . . . .").

### B. The Budget Neutrality Adjustment

"The Secretary calculates the budget neutrality adjustment by way of payment simulations. She computes a budget neutrality factor by comparing 'estimated aggregate payments using the current year's relative weights and factors to aggregate payments using the prior year's relative weights and factors.'" *Id.* (quoting 74 Fed. Reg. 24080 (May 22, 2009)). The Secretary calculates and applies the budget neutrality factor for a future fiscal year; however, no attempt is made to remove the effect of prior years' neutrality adjustments—resulting in a cumulative adjustment policy. *See* 58 Fed. Reg. 46270, 46346 (Sept. 1, 1993). "In the Secretary's view, a cumulative budget neutrality adjustment is mandated by the language of 42 U.S.C. § 1395ww(d)(4)(C)(iii) and the nature of the hospital-specific rate[ ]" because if she removed the prior budget neutrality adjustment the hospital-specific amounts would be artificially high, thereby resulting in higher aggregate payments than permitted under the statute. *Adirondack Med. Ctr.*, 29 F. Supp. 3d at 31. The Secretary has applied a cumulative budget neutrality adjustment in each successive fiscal year since 1994. In other words, she has not removed the effects of prior years' adjustments when calculating the budget neutrality adjustment for the upcoming fiscal year.

Here, plaintiffs argue that the Secretary is applying the adjustment twice to each plaintiff's hospital-specific rate, which is contrary to the statutory commands to recalibrate the DRG weights in a budget neutral manner and to calculate a base-year

rate using "100 percent" of a hospital's allowable operating costs of inpatient hospital services.

### C. Hospital-Specific Rates

SCHs are paid either the federal rate[5] or their hospital-specific rate, whichever is higher. *Adirondack Med. Ctr.*, 29 F. Supp. 3d at 32 (quoting *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 695 n.2 (D.C. Cir. 2014). MDHs are paid a rate that is calculated by taking the federal rate plus 75% of the difference, if any, between the federal rate payment and their hospital-specific rate payment. *Id.* at 32–33. The hospital-specific rate is particular to each hospital—calculated with a base amount derived from the historic operating costs at each individual hospital. *Id.* at 33. Congress has authorized set base years, and SCHs and MDHs can select the highest base year that yields the greatest aggregate payment.[6]

Calculating the hospital-specific rate is a three-step process.

> First, the hospital's historic average cost per patient in a particular base year is divided by the average patient DRG weight for that base year, repeated for each base year authorized by Congress. Second, the highest resulting quotient is multiplied by an update factor.[7] That product is further multiplied by the applicable budget neutrality adjustment for the year of treatment. Finally, the resulting product is multiplied by the DRG

---

[5] The "federal rate" is computed from a formula that takes a standardized base amount (derived from national data based on the average operating costs of inpatient hospital services) and multiplies it by the BNA for the upcoming year. The product from this calculation is then multiplied by the DRG weight that corresponds to the patient's diagnosis at discharge. *Adirondack Med. Ctr.*, 740 F.3d at 694.

[6] MDHs may use Fiscal Years 1982, 1987, or 2002 as a base year. SCHs may use Fiscal Years 1982, 1987, 1996, or 2006 as a base year. *See* 42 C.F.R. § 412.92(d); *id.* § 412.108(c).

[7] ("[T]o account for inflation ... between the base year period and the payment year period, CMS applies an update factor to the hospital's average case-mixed adjusted base-period operating cost per discharge.").

-7-

weight applicable to the discharged patient, thus arriving at the actual Medicare reimbursement.

*Id.* (internal citations omitted).

In 2006, Congress added Fiscal Year 2002 as a base year for calculating hospital-specific rates for MDHs, effective for cost reporting periods beginning on or after October 1, 2006. *See* Deficit Reduction Act of 2005, Pub. L. No. 109–171, § 5003(b), 120 Stat. 4, 32 (codified as amended at 42 U.S.C. § 1395ww(b)(3)(K) (2006)). Then, in 2008, Congress added Fiscal Year 2006 as a new base year for SCHs, effective for cost reporting periods beginning on or after January 1, 2009. *See* Medicare Improvements for Patients and Providers Act of 2008, Pub. L. No. 110–275, § 122, 122 Stat. 2494, 2514 (codified as amended at 42 U.S.C. § 1395ww(b)(3)(L) (2008)).

The Secretary's initial rebasing instructions for these new base years directed the budget neutrality adjustment to be applied only prospectively for subsequent years—as opposed to the prior cumulative manner. *Adirondack Med. Ctr.*, 29 F. Supp. 3d at 33–34. But the Secretary discovered the error and rescinded her initial rebasing instructions. *Id.* at 34. With respect to SCHs, the Secretary issued instructions to fiscal intermediaries that required application of full cumulative budget neutrality adjustments from Fiscal Year 1993 forward. *Id.* Likewise, "the Secretary issued a Final Rule for MDHs that directed inclusion of all cumulative Budget Neutrality Adjustments since Fiscal Year 1993, as of October 1, 2009, the beginning of Fiscal Year 2010." *Id.* This background history is relevant to plaintiffs' present claim.

IV. **The Parties' Contentions**

While there has been some debate whether the statute compels the Secretary to apply the budget neutrality adjustments to the DRG weights themselves, rather than to the payment rate, both parties agree that the Secretary's decision to apply the adjustment to the payment rates rather than the DRG weights should have no effect on payment. Plaintiffs instead argue that the Secretary's decision to reduce a new base year's costs by the cumulative budget neutrality adjustment for years prior to that new base year is impermissible. Plaintiffs acknowledge that the Secretary applies the budget neutrality adjustments once (through the use of the average DRG-weight as a divisor), but argue that it is being done a second time when she subsequently applies the budget neutrality adjustments to the payment rates. Consequently, plaintiffs argue that they are not given the option of receiving 100% of the allowable operating costs of inpatient hospital services. Plaintiffs claim that the Secretary is required by statute to use 100% of the base-year operating costs. Specifically, plaintiffs claim that the Secretary's separate application of a cumulative budget neutrality adjustment reduced payments to MDHs and SCHs by an additional 1.74% and 2.28%, respectively, every year since 2009.

Plaintiffs explain that the Secretary is applying the DRG recalibration adjustment twice—once by dividing by an "artificially high" case mix index, and once through application of the budget-neutrality factor. What is unique about a new base year is that the base-year hospital specific rate is calculated by dividing the hospital's costs by the hospital's average DRG weight, the same DRG weights that require a 2.28% budget neutrality adjustment because they are artificially high.

The Secretary responds that her rebasing requirements for SCHs in FY2009 and FY2010 and MDHs in FY2010 comported with all statutory requirements as well as with her longstanding methodology for cumulative adjustments. The Secretary acknowledges that under plaintiffs' preferred method, they would be paid more. But the Secretary claims that her methodology yields budget neutrality and ensures comparability between federal and hospital-specific rates. The Secretary further argues that plaintiffs have not established her method of calculating payments is outside her authority under the Medicare Act; nor has the Secretary acted arbitrarily or capriciously in utilizing her methodology.

V. **APA Standard of Review**

The Medicare statute, 42 U.S.C. § 1395oo(f)(1), provides for review of the Secretary's final decision in this case under the APA. *See* 5 U.S.C. § 706; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Here, the court determines "two administrative-law inquiries: (1) whether the Secretary acted within the confines of the authority delegated to her by Congress; and (2) whether there was a rational basis for her actions." *Adirondack Med. Ctr.*, 29 F. Supp. 3d at 36. The court may set aside the Secretary's decision if it is contrary to statute, arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)–(D); *Sunshine Haven Nursing Operations*, 742 F.3d at 1252.

A. **The *Chevron* Framework**

"In reviewing the Secretary's interpretation of the Medicare Act, the [c]ourt follows the two-step framework set forth in *Chevron, U.S.A., Inc. v. Nat'l Res. Def.*

*Council*, 467 U.S. 837, 842–45 (1984), and first asks 'whether Congress has directly spoken to the precise question at issue[.]'" *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 251 (D.D.C. 2015) (internal citations omitted). If the first step is met, the court must then "give effect to the unambiguously expressed intent of Congress." *Id.* at 251–52. "If the statute is 'silent or ambiguous with respect to the specific issue,' the [c]ourt next asks 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* at 252. When "an agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, [courts] give the agency's interpretation *Chevron* deference." *Adirondack Med. Ctr.*, 29 F. Supp. 3d at 36–37.

### B. Arbitrary and Capricious

An agency's action is arbitrary or capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court does not substitute its judgment for that of the agency even if it believes another choice may be better. *See id.* ("the scope of review under the 'arbitrary and capricious' standard is narrow").

## VI. Discussion

### A. The Secretary's policy choice is rational

The Secretary argues that her ability to apply pre-base year budget neutrality adjustments is a deliberate policy choice, not a mathematical error. "The Secretary is

fully aware of the reduction in a base year's payment rate that occurs because of her methodology . . . [but] employ[s] this methodology to ensure that any increase in payments to a hospital in a new base year are due to an actual increase in that hospital's costs." (Dkt. 21, at 28). The Secretary does not view a new base year as a "reset." Instead, the purpose of a new base year is to determine rates based on updated data that capture changes in costs that a hospital might experience from one base year to the next. And because hospitals paid under the federal rate have cumulative budget neutrality adjustments factored into their new standardized rate for each fiscal year, the Secretary applies cumulative budget neutrality adjustments to new base years for SCHs and MDHs to maintain comparability between the hospital-specific rate and the federal rate.

Plaintiffs do not dispute that the Secretary needs to apply the budget neutrality adjustments once, but argue that she goes on to apply the adjustment a second time, thereby destroying comparability. And the only time the double counting occurs is when a new base year is implemented. This is so because the average DRG weight (or case-mix index) is used as a divisor when calculating the base-year hospital-specific rate. But the Secretary has explained that normalization of the DRG weights after recalibration does not result in budget neutrality. Therefore, the Secretary goes one step further and applies the cumulative adjustments to the hospital-specific rate to achieve budget neutrality; just as she does with the federal rates.

The court defers to the Secretary on this issue. Plaintiffs have not shown that her method of setting a new base year and applying cumulative adjustments is arbitrary or

capricious. Furthermore, to the extent that plaintiffs are arguing that the Secretary's methodology will eventually cause their payments under the hospital-specific rate to reach zero, plaintiffs have not shown they are being treated any differently than hospitals paid at the federal rate.

### B. The Secretary's reasoning is consistent

Plaintiffs state that the Secretary initially disagreed with commenters on this issue during the rulemaking and comment session. Plaintiffs contend that even if the Secretary now claims her double-counting method is a policy choice, she failed to explain her choice during rulemaking or provide any explanation as to why it was appropriate at that time. Consequently, they argue, the Secretary's present position is a post hoc rationalization.

The court disagrees with the plaintiffs' position.[8] The Secretary noted the commenters' claim that "the application of a cumulative budget neutrality adjustment factor for the DRG changes from FYs 1993 through 2002 doubles the impact of this adjustment on the hospital-specific rates." FY 2010 Final Rule, 74 Fed. Reg. 43896. The Secretary disagreed and responded that:

> the hospital's case-mix index for FY 2002, which is calculated using DRG weights after normalization, do not reflect national average case weight change. We disagree with commenter's assertions that the average case weight from FYs 1993 through 2002 increased due to recalibration and that the cumulative budget neutrality adjustment built into the Federal rates and hospital specific rates for this time period offsets an average case

---

[8] The Secretary argues that plaintiffs did not preserve their procedural challenge to the Secretary's inconsistent and/or post hoc rationalizations from the responses during the rulemaking session to the current lawsuit because this claim was not identified in their complaint. Because the court finds that the Secretary's explanations are consistent and rational, the court does not address whether plaintiffs failed to preserve this argument.

weight increase due to recalibration. The cumulative budget neutrality adjustment is not already being accounted for when the fiscal intermediary divides the FY 2002 average cost per discharge for a hospital by the hospital's case-mix index for FY 2002.

*Id.* The Secretary rejected other comments that she was misapplying or erroneously duplicating adjustments, and ultimately finalized the policy discussed in the proposed rule to apply a cumulative budget neutrality adjustment factor to MDHs' FY 2002 hospital-specific rates to adjust for each fiscal year from 1993 forward, as is done for the Federal rate. *Id.* at 43897.

The Secretary's current position, while it may have been fine-tuned, is not a "convenient litigating position" or "post hoc rationalization." *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (absent inconsistencies or reasons to suspect, the general rule is courts defer to "an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief"). The Secretary admits that this litigation has allowed her to detail her positions more thoroughly, but the court agrees that she has simply expanded upon her initial position; she has not altered it. Furthermore, the court does not find that plaintiffs have been unfairly surprised because they have been subject to cumulative budget neutral adjustments since 1993, excluding the inadvertent error in the initial 2002 and 2006 rebasing instructions. *See generally Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170–171 (2007) (deferring to new interpretation that "create[d] no unfair surprise" because agency had proceeded through notice-and-comment rulemaking); *Martin v. Occupational*

*Safety and Health Review Comm'n*, 499 U.S. 144, 158 (1991) (identifying "adequacy of notice to regulated parties" as one factor relevant to the reasonableness of the agency's interpretation).

### C. "Based on 100 percent"

Plaintiffs argue that the Secretary's methodology fails to reimburse them at 100% of the base-year operating costs despite the statutory command to use "100 percent" of an SCH's base-year operating costs.

> For any cost reporting period beginning on or after April 1, 1990, with respect to a subsection (d) hospital which is a sole community hospital, payment under paragraph (1)(A) shall be--(I) an amount based on 100 percent of the hospital's target amount for the cost reporting period, as defined in subsection (b)(3)(C) of this section, or(II) the amount determined under paragraph (1)(A)(iii),whichever results in greater payment to the hospital.

42 U.S.C. § 1395ww(5)(D)(i).

The court finds that 100% of the target amount is the starting point from which the Secretary determines payment. *Cf. Fort Peck Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*, 367 F. App'x 884, 890 (10th Cir. 2010) (interpreting "based on" in Native American Housing and Self-Determination Act). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* (quoting *Nat'l Assoc. of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)). The Tenth Circuit along with other courts has determined that "based on" is ambiguous and means the beginning or starting point of the formula. *See, e.g., id.* ("As used within § 4152(b) where Congress explicitly allowed for further definition of factors by HUD, the phrase 'based on' is not

synonymous with 'equal to.'"); *Sierra Club v. EPA*, 356 F.3d 296, 306 (D.C. Cir. 2004) (the term "based on" is ambiguous and does not require the agency's findings rest solely upon a particular model); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111 (9th Cir. 2000) ("based on" may be reasonably interpreted as indicating a "starting point" or "foundation").

The Secretary's interpretation of "based on 100 percent" is reasonable. More importantly, the Secretary is in compliance with her obligation to apply payments in a budget neutral manner. Therefore, plaintiffs have not shown the Secretary's methods violate the Medicare statute.

## VII. Conclusion

The Secretary claims that her methodology yields budget neutrality as well as ensures comparability between federal and hospital-specific rates. According to the Secretary, normalization of the DRG weights after recalibration does not result in budget neutrality. Because she is required by the Medicare statute to achieve budget neutrality, the Secretary believes application of the budget neutrality adjustment to the hospital specific rates is necessary to achieve budget neutrality for a new base year. And she applies the cumulative adjustments to the hospital-specific rates in a new base year just like she does to the federal rates. Even if there are other ways of calculating payments, the court does not second-guess the Secretary's policy when it is not arbitrary or capricious.

Furthermore, the court does not find that the Secretary violated any procedures with respect to the rule making and comments period. Contrary to plaintiffs' belief, the

Secretary does not admit that she is duplicating the budget neutral adjustment. Nor are her explanations inconsistent or irreconcilable with her responses stated during the rulemaking session. The court also agrees with the Secretary's argument that "based on 100 percent" is the starting point—not the end point—for the Secretary's calculations. Plaintiffs have failed to meet their burden to show deference to the Secretary's methodology is improper.

IT IS THEREFORE ORDERED this 31st day of August, 2017, that the plaintiffs' motion for summary judgment (Dkt. 19) is DENIED.

IT IS FURTHER ORDERED that the Secretary's motion for summary judgment (Dkt. 22) is GRANTED.

s/ J. Thomas Marten  
J. Thomas Marten, Judge